Michele RAPOSA, Appellant,

v.

MEADE SCHOOL DISTRICT 46–1; Arnold Wold, Individually and in his capacity as Superintendent of Meade School District 46–1; Marlyn Murphy, individually and in her capacity as Principal of Rural Meade School District 46–1; Meade School District 46–1 Board: David Hersrud, Linda Matkins, Bruce Hubbard, Curtis Nupen, Darrel Forrester, Margariette Kleven, Ross Lamphere, Joe Isaacs and Carl Wahl, Individually and in their capacity as Board Members of School District 46–1, Appellees.

No. 85–5119.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 9, 1985.

Decided May 13, 1986.

*Jackson.* *See Jackson,* 717 F.2d at 1057 (Posner, J., concurring in part and dissenting in part).

**1350**

Cynthia A. Howard, Deadwood, S.D., for appellant.

William H. Coacher, Sturgis, S.D., for Meade School Dist.

Debra D. Watson, Rapid City, S.D., for Marlyn Murphy.

Before ROSS, Circuit Judge, BRIGHT, Senior Circuit Judge, and BOWMAN, Circuit Judge.

ROSS, Circuit Judge.

Appellant Michele Raposa, a nontenured school teacher, brought an action under 42 U.S.C. § 1983 to recover compensatory and punitive damages against appellees Board of Education and its members, the School Superintendent, Wold, and the School Principal, Murphy. Raposa claimed that appellees' actions, culminating in her transfer to another school in the school district, violated her constitutional rights of due process and freedom of speech. The district court[1] granted summary judgment for defendants and Raposa appeals. For the reasons below, we affirm.

**Facts**

Michele Raposa was hired by Meade School District 46–1 in 1981 to teach the lower grades at a two-room school house in Stoneville, South Dakota. Stoneville was a rural school with nineteen students, ten in the elementary grades. This was Raposa's first teaching position. Her contract was renewed for the 1982–83 school year. Teacher evaluations were done twice each year by the principal, according to school district policy. Although a personality conflict had developed between Raposa and the principal Murphy, all of Murphy's formal evaluations of Raposa had been favorable according to Superintendent Wold. Both administrators agreed that Raposa was a good classroom teacher.

About mid-April of 1983 Raposa contacted the South Dakota Department of Social Services and reported a case of suspected child abuse. Within the next two weeks a social worker from that department visited with Raposa and the child at Stoneville

---

1. The Honorable Andrew W. Bogue, Senior Judge, United States District Court for the District of South Dakota.

school, and then called on the child's parents. The child's parents, later that same day, complained to Raposa about her report. Raposa refused to talk with them without a social worker present. In late April 1983, the school principal for the first time began receiving complaints from parents concerning Raposa. The principal typed a Form 1312, "Complaint Concerning School Personnel" at the request of one parent. This complaint contained only the following general allegation: "We feel the Board of Education should be aware of certain things concerning Miss Raposa, lower grade teacher at Stoneville." This form was subsequently signed by six families. This "1312" complaint was given to one of the school board members who delivered it to the school superintendent.

At the late-April board meeting, held to discuss contract renewals and teaching assignments, the superintendent advised the board members of the "1312" complaint and the complaint was discussed. The president of the board cautioned that if a child abuse report was the precipitating factor of the complaint, that report did not furnish the foundation for taking any action. He said the board had to protect their employee who had a statutory duty to report suspected child abuse. The board voted to place Raposa in an unassigned status until they received more information. The next day the superintendent advised the signers of the "1312" complaint, in writing, that they would need to submit individual complaints and would need to be more specific before the board could consider their complaints. Board members began to receive telephone calls from parents. Between May 5 and May 17, 1983, eight Stoneville families submitted "1312" complaints. Two mentioned the child abuse report. Other complaints were that Raposa threw out *Weekly Readers* instead of using them, that she failed to teach social studies as required, did not cooperate with upper grade teachers, was unable to accept criticism from parents, failed to properly supervise playground activities, and created dissension in the community.

In May the superintendent wrote Raposa advising her that he would be recommending to the board that she be reassigned to Sturgis, another, larger, school in the district, for the next school year. Wold's letter invited Raposa to come to his office, review the criticisms received, and to write responses if she would like. Evidently Raposa did not so respond. In May, at the next regular board meeting, a spokesman for a delegation of parents read a statement stating that nine out of twelve families of the Stoneville school, with one family remaining neutral, requested that Raposa not be assigned to Stoneville for the next school year. At the June board meeting, attended by Raposa and her attorney, the superintendent said he felt the strong negative feelings of some of the parents would carry over into the classroom and create an unfavorable teaching situation. However, the superintendent felt she was an excellent classroom teacher and wanted to keep her in the system. The board members agreed and voted to assign Raposa to the Sturgis school. Raposa was informed of this in writing on June 24. The validity of the complaints was considered not relevant by the board in light of the strong anti-Raposa sentiment and in view of the size of the community. After Raposa's request for an executive session of the board, she was told to follow the grievance procedure prescribed by school district policy and state statute. This she did not do. Raposa responded by resigning her teaching position and filing suit in district court. The district court granted summary judgment for the defendants and this appeal by Raposa followed.

## I. First Amendment

In determining whether a public employee's first amendment rights have been violated, a court must decide whether the employee has shown that he engaged in a protected activity, *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), whether the employee has shown that the conduct was a motivating or substantial factor in the decision made against the employee, *Mt. Healthy*

*School City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), and whether it has been shown that the same decision would have been made even in the absence of the protected activity. *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); *Mt. Healthy, supra,* 429 U.S. at 287, 97 S.Ct. at 576.

Under the *Pickering* balancing test, a court's job is to seek "a balance between the interests of the [teacher], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983); *quoting Pickering, supra,* 391 U.S. at 568, 88 S.Ct. at 1734; *see also Patterson v. Masem,* 774 F.2d 251, 257 (8th Cir.1985). The courts have given the government wide discretion in managing its internal affairs. *Connick, supra,* 461 U.S. at 151, 103 S.Ct. at 1692, (*citing Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974)); *see also Bowman v. Pulaski County Special School District,* 723 F.2d 640, 644 (8th Cir.1983). While declining to formulate a general standard by which to measure such statements, *Connick, supra,* 461 U.S. at 154, 103 S.Ct. at 1693, *Pickering, supra,* 391 U.S. at 569, 88 S.Ct. at 1735, the Supreme Court has given some factors to be weighed in the *Pickering* balance including the degree of public concern; whether the speech impeded the employee's ability to perform job responsibilities; the importance of close working relationships with co-workers; the need for harmony in the workplace; the time, place, and manner of the speech; the context in which the dispute arose. *Connick, supra,* 461 U.S. at 150–54, 103 S.Ct. at 1691–93; *Pickering, supra,* 391 U.S. at 569–73, 88 S.Ct. at 1735–37; *Bowman, supra,* 723 F.2d at 644.

■ Some of the factors to be considered strongly favor the appellant. The fact that a state law, S.D.CODIFIED LAWS ANN.

(SDCL) § 26–10–10 (1984), and a school board policy, 4116.1, of the Meade School District required teachers to report suspected child abuse is evidence of the great degree of public interest in the subject. The time, place, and manner of the speech all could be characterized as appropriate in this case. Raposa submitted a report to the appropriate state agency. She discussed the report with a social worker when the social worker visited the school, and she declined to further discuss the report without the social worker being there.

Other factors favor the school district. There is no question that appellant's speech in some way contributed to the turmoil existing in the Meade School District and at Stoneville school. Following the report of suspected child abuse, a rash of complaints erupted concerning her attitude, relationships with parents of school children, and failure to teach current events and social studies as provided by school curriculum. The complaints reflected hostility that was present before and only surfaced after Raposa's report. The responsibilities of a school in educating students require a certain harmony to exist. The parents' strong feelings cannot help but affect their children's feelings. Undercurrents of hostility and ill will in the classroom can undermine the educational process. The appellant's ability to perform her teaching duties was greatly impeded by all of the turmoil, and the board determined that her effectiveness as a teacher at Stoneville was greatly impaired. *See generally Pickering, supra,* 391 U.S. at 572–73, 88 S.Ct. at 1736–37; *Patterson, supra,* 774 F.2d at 257; *Knapp v. Whitaker,* 757 F.2d 827, 842 (7th Cir. 1985). Although aware of the coincidence of the child abuse report and this upswelling of complaint, resentment, and criticism against appellant, the board felt the best course of action was to transfer appellant to Sturgis.

We are very much aware, as the Supreme Court has cautioned, that a stronger showing of the need for harmony in the workplace may be necessary if the employ-

ee's speech substantially involves matters of public concern. *Connick, supra,* 461 U.S. at 152, 103 S.Ct. at 1692. Under the particular facts of this case, the importance of harmony and cohesion in the Stoneville school outweighs the teacher's interest in commenting on a matter of public concern. This is in contrast to *Bowman, supra,* where we found constitutionally protected speech under the facts of that case. Not only was the teachers' speech in *Bowman* found to be protected, but their transfer was intended to be a disciplinary action. *Bowman, supra,* 723 F.2d at 645. Their transfers, from a junior high school to high schools, required the teachers to drive many miles further to their new schools and "to teach unfamiliar subjects on short notice without the support normally given to an instructor." *Id.* Punishment was not an element in appellant's transfer here.

## II.  Due Process

Under *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) a nontenured public school teacher is entitled to procedural due process only if administrative action deprives the teacher of an interest in liberty or an interest in property. *Clark v. Mann,* 562 F.2d 1104, 1115 (8th Cir.1977); *Cato v. Collins,* 539 F.2d 656, 659 (8th Cir.1976); *Buhr v. Buffalo Public School District No. 38,* 509 F.2d 1196, 1199 (8th Cir.1974).

## III.  Property Interest

In *Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709, the Supreme Court held that a person must have more than a unilateral expectation to have a property interest protected by the due process clause; there must be a legitimate claim of entitlement. *See also Smith v. West Memphis School District,* 635 F.2d 708, 709–10 (8th Cir. 1980). The teacher must establish such claim of entitlement, and its sufficiency by referring to state law. *Easter v. Olson,* 552 F.2d 252, 253 (8th Cir.1977). South Dakota case law does not recognize a prop-

erty interest in a teacher's particular teaching assignment. *Collins v. Wakonda Independent School District No. 1,* 252 N.W.2d 646, 648 (S.D.1977); *Goodwin v. Bennett County High School Independent School District,* 88 S.D. 639, 226 N.W.2d 166, 168 (1975). "A teacher, in acquiring a permanent status, does not thereby acquire a vested right to teach any certain class or in any certain school." *Goodwin, supra,* 226 N.W.2d at 168. Even a tenured teacher, which appellant was not, SDCL § 13–43–9.1 (1982); SDCL § 13–43–10.2 (1982), SDCL § 13–43–10.2 (1984), cannot assert such a property interest against "the general power and right of school authorities to assign teachers to particular classes and to particular schools in accordance with their judgment and desire *reasonably exercised." Goodwin, supra,* 226 N.W.2d at 168.

Appellant claims that she signed a contract to teach the lower grades at Stoneville. She claims a property interest in not being transferred without a prior hearing. The Meade School Board policy that covers the assignment and transfer of teachers is Policy 4111, which reads in pertinent part:

> The Superintendent shall be responsible for the selection and assignment of all school employees subject to review and confirmation by the School Board.
>
> \*    \*    \*    \*    \*    \*
>
> All employees shall be given written notice of their assignment in their individual employment contract for the new school term. In the event changes in such assignments are proposed, the employee affected shall be notified promptly and consulted.
>
> \*    \*    \*    \*    \*    \*
>
> If a transfer is deemed necessary by the Board during the term of the contract, the employee or employees affected shall be given written notice of their transfer, and the employees so affected shall have an opportunity to consult with the Board prior to any transfer being complete, provided, however, that the decision of the Board shall be final in this regard.

Policy 4111 allows a change of assignment. It also allows a transfer during the term of the contract. Appellant charges that she was transferred during the term of her contract. She argues such term began when she had signed the contract. However, the school board and the superintendent have used the phrase "during the term of the contract" to mean during the school year. Thus the term "transfer" is used when a change is made during the school year, while the expression "change in assignment" is used when a change is made prior to the start of a school year. We agree with the district court's analysis and conclusion that appellant was not transferred during the term of her contract; rather she was reassigned as allowed and prescribed by Policy 4111.

## IV. Liberty Interest

Appellant asserts that her reputation has been damaged and her employment prospects impaired by the written complaints put in her personnel file. However, she does not allege, nor did she prove, that her files were provided to any other school. Raposa applied to one school and stated that she does not know why she was not offered the position. She claims a liberty interest in her reputation which requires notice and an opportunity to be heard.

In *Roth, supra,* the Supreme Court held that notice and a hearing are required if the government imposes a "stigma or other disability" that damages a person's standing in the community or forecloses a person's "freedom to take advantage of other employment opportunities." *Id.* 408 U.S. at 573, 92 S.Ct. at 2707. The Ninth Circuit has held that the *Roth* test "distinguishes between a stigma of moral turpitude, which infringes the liberty interest, and a charge of incompetence or inability to get along with coworkers which does not." *Stretten v. Wadsworth Veterans Hospital,* 537 F.2d 361, 366 (9th Cir.1976), *quoted in Elkin v. Roudebush,* 564 F.2d 810, 813 (8th Cir. 1977). Teacher competencies are not "matters of constitutional dimensions," but are uniquely appropriate to state and local administration. *Norbeck v. Davenport Com-*

*munity School District,* 545 F.2d 63, 69 (8th Cir.1976), *cert. denied,* 431 U.S. 917, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977). *See Scheelhaase v. Woodbury Central Community School District,* 488 F.2d 237, 244 (8th Cir.1973), *cert. denied,* 417 U.S. 969, 94 S.Ct. 3173, 41 L.Ed.2d 1140 (1974). A statement that is basically one alleging conduct that fails to meet professional standards is a statement which does not impinge upon a liberty interest. *Norbeck, supra,* at 69. In this case, the allegations made with respect to appellant pertained to her performance as a teacher and to her interpersonal relationships in the community. The allegations here "are not the type of stigmatizing charges which will preclude her from serving as a [teacher]." *Elkin, supra,* at 813. Indeed, appellant could have remained as a teacher in the Meade School District. Instead she chose to resign. In addition, the reassignment of a teacher, unless it involves a change in status that could be regarded as essentially a loss of employment, does not give rise to a liberty interest meriting due process protection. *See Hughes v. Whitmer,* 714 F.2d 1407, 1417 (8th Cir.1983), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984).

As appellant did not establish that her speech was protected, nor that she had a property interest or liberty interest, summary judgment was proper. The judgment of the district court is affirmed. Each party shall pay its own costs.

BRIGHT, Senior Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's conclusion that the school district did not violate Raposa's first amendment rights, but emphasize that the facts before us are unique. This case is exceptional because both the teacher and the school district held essentially identical interests—to protect the children that Raposa taught. Raposa reported a suspected case of child abuse. The state required her to report her suspicions and society as a whole is greatly concerned in protecting children from abuse. A school board ought not to penalize a teacher for reporting suspected child abuse.

However, in this particular instance, the interests of the children were best served by transferring Raposa to another school. Raposa taught at a school attended by children from only twelve families. Almost a month after they became aware that Raposa filed the child abuse report, nine out of the twelve families persisted in calling for Raposa's removal. The turmoil showed no signs of abating at the time of Raposa's transfer. Children cannot be expected to ignore such intense and pervasive unrest. Their education undoubtedly will be negatively affected when their parents are bitterly opposed to their teacher. On these unique but disturbing facts, therefore, I must agree that the school district did not violate Raposa's first amendment rights when it transferred her.

I believe that the school board may have deprived Raposa of a liberty interest in her reputation, however, by not providing her with notice and a hearing before placing the parents' complaints in her personnel file. Raposa contends that this personnel file was available to prospective employers. She also asserts that she unsuccessfully sought a teaching position in the public school system, and obtained a low-paying job in a day care center only by concealing her file. The record does not reveal whether any school to which Raposa applied received a copy of the personnel report.

Protected liberty interests are established when state action "has operated to bestow [stigma] with *an attendant foreclosure from other employment opportunity.*" *See Paul v. Davis,* 424 U.S. 693, 705, 96 S.Ct. 1155, 1162, 47 L.Ed.2d 405 (1976) (emphasis supplied) (quoting *Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 898, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). In my opinion, the school district deprived Raposa of a liberty interest deserving due process protection if the unanswered complaints in Raposa's file affected her ability to obtain a teaching job after she refused the school district's reassignment and resigned.

I therefore dissent from the majority's holding that, as a matter of law, the school district did not violate Raposa's rights to due process by failing to provide her with notice and a hearing on the complaints placed in her file. Raposa should be permitted to show that the complaints were unfounded, and that they hindered her ability to obtain a teaching job. To the extent that Raposa can prove this deprivation of a protected liberty interest, she is entitled to those damages that she incurred during the period that she remained unable to remove the unfortunate comments from her file, where they served as a deterrent to employment as a teacher.[1]

---

1. Raposa had the right, under state law, to have the complaints expunged from her personnel file after two years. Ordinarily, the existence of this right to have the derogatory material removed from the personnel file would limit any damages to the two-year period.